It appears that the appellant, Kenneth Qualls, was indicted for third-degree escape, attempted murder, domestic violence, first-degree burglary, and unlawful possession of a controlled substance. He was convicted of third-degree escape, a *Page 854 
violation of § 13A-10-33, Ala. Code 1975, and was acquitted of the remaining charges. The trial court sentenced him to serve a term of seven years in prison, but split the sentence and ordered him to serve two years followed by five years on supervised probation. The appellant did not file any post-trial motions. This appeal followed.
The State presented evidence that the appellant and the victim, Ginger Davis, had dated and had a son; that, during the early morning hours of January 19, 2002, the victim was sleeping on the couch in her home, and their son was sleeping in his crib; that, around 1:00 a.m., the victim woke up when the appellant came into her house; that the victim had not invited the appellant to her home; that the appellant came over to the couch, knelt down, put his arms around the victim, and asked her if she loved him; that, after the victim told the appellant that she did not love him and that she wanted him to leave, the appellant threw her to the floor, threw her around the room, and told her that he was going to kill her; that she and the appellant struggled; that, at one point, the victim hurt her leg and crawled onto the couch; that the appellant pulled the victim to the floor, straddled her, and told her that it was a full moon, that it was a good night to die, that she was going to die, and that he had come to kill her; that the appellant pulled a knife out of his pocket, opened it, and stabbed the victim in the neck; that the victim's hand was cut when she grabbed the blade of the knife and pulled it out of her neck; that the appellant got off of the victim; that, at some point, the appellant went to bed and went to sleep; and that the victim telephoned law enforcement authorities while the appellant was sleeping. The State also presented evidence that, when law enforcement officers arrived at the victim's house, the appellant was asleep; that the appellant was wearing only his underwear, and his pants and shirt were next to the bed; that, when law enforcement officers woke the appellant, he started trying to wrestle them; that the officers finally handcuffed the appellant with his hands behind his back; that they tried to get the appellant to calm down so they could put his clothes on him, but were not able to do so; that the officers took the appellant, put him in the backseat of a patrol vehicle, put his clothes on the front seat of the patrol vehicle, and went into the victim's home; that the windows of the patrol vehicle were up, the back doors were locked, the engine was running, and the heater was on; that law enforcement officers subsequently discovered that the appellant was not in the patrol vehicle; that the officers searched for the appellant and found him, between thirty-five and forty minutes later, coming from behind a trailer that was down the road and in a wooded area that was not very far from the victim's house; that they subsequently transported the appellant to the jail; and that, when they searched the appellant's pants at the jail, officers found a pocket knife that appeared to have blood stains on it and a glass vial that contained methamphetamine in one of the appellant's pants pockets.
The appellant testified that the victim had telephoned him on the evening of January 18, 2002, and asked him to bring some medicine for their son; that he arrived at the victim's house around 10:30 p.m. and knocked on the door, and the victim let him in; that the victim's hand was wrapped in a dishtowel, and she told him that she had cut her hand while opening a can of baby formula; that the victim's house was cold, filthy, and smelled; that their son was wearing only a diaper that was soaking wet and was covered with only a sheet; that their son had a rash on his bottom; that he asked the victim about *Page 855 
lotion for the rash, and the victim told him that she was out of everything and was tired of doing everything by herself; that he and the victim got into an argument about the condition of their son and the house, but they did not get into a physical altercation; that, after taking care of their son, he went to bed and went to sleep; that, when he woke up, law enforcement officers were putting handcuffs on him; that he asked the officers why he was being arrested, but they would not say anything; that he asked the officers to give him his pants; that the officers took him out in his underwear and put him in the patrol vehicle; that the temperature was in the teens, the vehicle was not running, the back window was halfway down, and he was afraid he would freeze; that he was able to get his head through the back window and flipped out onto the ground; that he went to a neighbor's trailer and knocked on the door; that he saw the deputies walking around the vehicles and looking for him; that he said, "`[H]ere I am,'" and walked to them; and that the officers took him to jail. (R. 450.) He also testified that he did not have drugs in his pocket when he went to the victim's house and that he did not have a knife that night. Finally, he testified that he did not touch the victim and that he did not know how the victim's neck had been injured.
The defense also presented evidence that the victim had told other people that the appellant had not cut her hand or stabbed her in the neck; that she had cut her hand in the kitchen the night before the incident in question; and that she had stabbed herself in the neck so that the appellant could not get custody of or visitation with their son. Finally, the defense presented evidence that the victim had told a subsequent boyfriend that she wanted him to "take care of" the appellant so that he would not be able to get custody of or visitation with their son. (R. 350.)
The appellant argues that the State improperly elicited testimony that he did not make a statement to law enforcement officers after he was arrested. During the State's cross-examination of the appellant, the following occurred:
 "[PROSECUTOR:] And when you talked to the deputies or the police, they gave you an opportunity to make a statement, didn't they?
 "[THE APPELLANT:] Yes, sir — No, sir they didn't. They never did. I never did make a statement."
(R. 462-63.) The appellant moved for a mistrial, but the trial court denied the motion. The appellant also made a motion in limine to prevent the State from eliciting testimony that he had not made any statements and had not waived his Fifth Amendment rights before trial, which the trial court also denied. Subsequently, during its rebuttal, the State recalled one of the officers who had arrested the appellant, and the following occurred:
 "[PROSECUTOR:] Did you give [the appellant] an opportunity to make a statement?
"[DEFENSE COUNSEL]: Object.
"[WITNESS:] Ask that again.
 "[PROSECUTOR]: Did you read [the appellant] his rights?
"[DEFENSE COUNSEL]: Object.
"[WITNESS:] Yes, I did.
"[PROSECUTOR:] Did he make a statement?
"[DEFENSE COUNSEL]: Object and move for a mistrial.
"THE COURT: Same ruling.
"[WITNESS]: No, he didn't."
(R. 517-18.)
 "Under Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecution may not use the post-arrest, *Page 856 
post-Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), silence of a defendant as evidence of his guilt.
 "`. . . [W]hile it is true that the Miranda
warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.'
"Doyle, 426 U.S. at 618, 96 S.Ct. at 2245."
Burell v. State, 680 So.2d 975, 980 (Ala.Crim.App. 1996).
 "The receipt into evidence of testimony concerning an accused's post-Miranda exercise of the constitutional right to remain silent is itself a violation of the accused's constitutional right to remain silent. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); Houston v. State, 354 So.2d 825 (Ala.Cr.App. 1977), cert. denied, 354 So.2d 829 (Ala. 1978). The receipt of this evidence, may be harmless. `An error involving an infringement of a defendant's constitutional right can be held harmless only if the court is able to declare beyond a reasonable doubt that the error was harmless.' Houston, 354 So.2d at 828. (Emphasis added.)"
Harris v. State, 611 So.2d 1159, 1160-61 (Ala.Crim.App. 1992). In Mixon v. State, 596 So.2d 605, 608 (Ala.Crim.App. 1991), this court held that, for a Doyle violation to be harmless,
 "the State should prove 1) that the evidence of [the appellant's] guilt was overwhelming and that his defense was transparently frivolous; 2) that the prosecution made only a single reference to [the appellant's] silence and this reference was neither repeated nor linked with [the appellant's] exculpatory testimony; and 3) that the trial court properly instructed the jury upon sustaining the defense's objections. Houston v. State, supra, 354 So.2d at 829 (citing Chapman v. United States, 547 F.2d 1240, 1250 (5th Cir.), cert. denied, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977) and Adkins v. State, 265 Ala. 666, 93 So.2d 522 (1957))."
Although Mixon purports to set forth a three-pronged test for determining whether a Doyle violation is harmless, that standard is not appropriate in every case. The facts surroundingDoyle violations vary widely and do not lend themselves to being analyzed using the narrowly tailored standard set forth inMixon for determining whether they are harmless. Rather, the determination of whether a Doyle violation is harmless should be made on a case-by-case basis under the specific facts of each case. Accordingly, to the extent our decision in Mixon purports to set forth the only standard for determining whether a Doyle
violation is harmless, it is hereby expressly overruled.
In this case, the jury apparently believed the version of the facts the appellant presented at trial because it acquitted him of all charges except third-degree escape, which he specifically admitted during his trial testimony. The evidence about the appellant's guilt of third-degree escape was undisputed and overwhelming. Therefore, under these specific circumstances, any violation of Doyle was harmless.
For the above-stated reasons, we affirm the trial court's judgment.
AFFIRMED. *Page 857 
McMILLAN, P.J., and WISE, J., concur; SHAW, J., concurs specially, with opinion, COBB, J., dissents, with opinion.