WINDOM, Presiding Judge.
This Court's opinion of March 14, 2014, is withdrawn, and the following opinion is substituted therefor.
Michael Brandon Kelley appeals his convictions for two counts of capital murder and one count of sexual torture. Kelley was convicted of one count of capital murder for taking the life of Emily Milling during the course of a first-degree kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975; a second count of capital murder for taking the life of Emily during the course of sexual abuse, see § 13A-5-40(a)(8), Ala.Code 1975; and one count of sexual torture for acts he committed on Emily, see § 13A-6-65.1, Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Kelley be sentenced to death for his capital-murder convictions. The circuit court accepted the jury's recommendation and sentenced Kelley to death. It also sentenced Kelley to life in prison for his sexual-torture conviction.[1]
The State's evidence tended to show the following. On Friday, November 14, 2008, Emily and three friends, William Lloyd, Crystal Parker, and Bobby Norris, went to the Central Club, a nightclub in Leeds. They arrived at the club between 11 and 11:30 p.m. Emily left her purse and cellular telephone in her car and took only her driver's license and car keys into the club.
*1038 About an hour after they arrived at the club, Kelley approached the group and asked Lloyd if Lloyd remembered him. Lloyd stated that he did remember Kelley. Kelley then pointed his finger at Emily and called her by her maiden name, Emily Phillips.
Lloyd then saw Emily and Kelley have a conversation that lasted about 15 to 20 minutes. Emily and Kelley then walked up to Lloyd and Norris. Emily gave Norris the keys to her car. She told Lloyd and Norris that she and Kelley were going to go visit Kelley's cousin David Alan Heath and that they would be back in 20 minutes. Stephen Cook, who worked as security at the club, saw Emily and Kelley leave the club together.
Heath looked out his window when his dog started barking and saw Kelley's green Chevrolet Blazer sport-utility vehicle. According to Heath, Kelley stayed in the driveway for around 30 minutes but never came to the door.
Meanwhile at the Central Club, Lloyd worried when Emily had not returned by the time the club closed. Lloyd, Norris, and Parker waited for Emily outside the club after it closed. After waiting for awhile, the three drove Emily's car back to her house so that Parker could get her car and leave. After dropping off Parker, Lloyd and Norris drove around the area of the club looking for Emily. They then went back to the parking lot of the club and waited for Emily for an hour to an hour and a half. After Emily failed to return to the club, Norris drove Lloyd to Lloyd's aunt's house. Norris then went home.
The next day, Curtis Gomer, Kelley's cousin, went to work at Mike's Fabricating. Kelley's father, Mike, owned the fabricating shop, and family members used the dumpsters. Between 7 and 7:15 a.m., Gomer saw Kelley throw a number of garbage bags with blue ties into the dumpster.
Later that same day, Lloyd went to Norris's house to retrieve Emily's car. Lloyd took Emily's car to Kelley's mobile home to look for her. Lloyd knocked on Kelley's door, and Kelley answered. Lloyd testified that Kelley blocked the door. Lloyd asked Kelley about Emily's whereabouts, and Kelley, who Lloyd said was stuttering, shaking, and nervous, said he dropped her off at Heath's residence. Kelley then told Lloyd where Heath lived. Lloyd told Kelley that if he did not find Emily, he was going to go to the police. Lloyd then went to Heath's house and learned that Emily had not been there. When he was unable to find Emily, Lloyd picked up his aunt, and they returned Emily's car to her house. Later, Lloyd's aunt telephoned the police.
On the following Sunday, Larry Phillips, Emily's father, noticed that she was missing. That evening, Larry Phillips, Neil Phillips, Emily's brother, and, at some point, Brandon Milling, Emily's husband,[2] searched for her. Later that evening, Brandon Milling and Larry Phillips went to the police station and filed a missing-person report.
The following Monday morning, Renee Reaves, a detective sergeant with the Leeds Police Department, was assigned to investigate Emily's disappearance. That same morning, Detective Reaves received a telephone message from Kelley regarding Emily's disappearance. When Detective Reaves returned Kelley's call, Kelley stated that he wanted "to find out what was going on with ... Emily, [he had] heard she was missing and [he] wanted to see what was going on." (R. 622-23.) Kelley told Detective Reaves that he was *1039 with Emily Friday night at the club, that he took her to Heath's house, and that he then dropped her off back at the club.[3] Kelley also told Detective Reaves that he was a truck driver and was on a job in California.
After the telephone conversation with Kelley, Detective Reaves went to the Central Club and viewed surveillance videos that had been taken inside and outside the club. The videos showed Kelley and Emily leaving the club together but did not show them returning. After viewing the videos, Detective Reaves called Kelley to determine when he dropped her off at the club. Kelley told Detective Reaves that he dropped her off at the club before it closed for the night.
On the same day that he called Detective Reaves, Kelley also called Michael Russo, the president of Certified Motors, Inc., from whom Kelley had purchased the Blazer the previous Wednesday. Kelley told Russo that something had come up and that he would not be able to keep the Blazer. Kelley also told Russo that Russo could keep the down payment Kelley had made on the purchase and that the vehicle could be picked up at K & S Trucking, the company for which Kelley worked.
Meanwhile, Ron Westmoreland, Emily's boss at Stringfellow Lumber Company, learned that she was missing. He organized a search party consisting of 11 to 13 people. They searched the area between Kelley's mobile home and Leeds. The search party found Emily's body between 6:30 and 7:00 p.m. that evening. The body was located in an opening in a wooded area roughly 75 feet off Markeeta Road in Leeds.
Upon discovering the body, the search team contacted law enforcement. Forensic scientists Charlie Landon Pearce, Shane Golden, and Mark Hopwood, and Forensic Investigator Chris Crowe went to where the body was located to process the scene. After processing the scene, Investigator Crowe transported the body to the Huntsville Regional Laboratory Morgue.
Detective Aleisha Reannon Hollman spoke with Russo and located Kelley's Blazer at K & S Trucking. Detective Reaves obtained warrants authorizing officers to search Kelley's Blazer and his mobile home. Detective Hollman then went to K & S Trucking and secured the Blazer with evidence tape. The Blazer was moved to Murray's Garage in Leeds.
After processing the scene where the body was found, the forensic team went to Murray's Garage to search and to process Kelley's Blazer. In the cargo area of the Blazer, Pearce found red/brown stains that tested positive for blood. DNA from the bloodstains in the Blazer matched samples taken from Emily. When the forensic team finished processing the Blazer, they went to Kelley's mobile home. In the mobile home, the team located numerous red/brown stains. The stains were found in the hallway, the east wall, the bathroom, near the back door, the front door, the master bedroom, and the west wall. Of the samples of the stains that were tested for DNA, all were found to match Emily's blood samples. Also, on the west wall was a mixture bloodstain. The DNA testing of the mixture stain revealed that Emily was the donor of the major component and that Kelley was included as a possible donor of the minor component.
In addition to collecting samples of the visible stains, the forensic team sprayed luminol in the mobile home. Pearce testified that luminol is a product that reacts to blood and allows them to detect blood that has been diluted or that is on surfaces that have been cleaned. The luminol showed *1040 the outline of a body in the shower and drag marks from the shower to the front door.
On Tuesday morning, Gomer picked up Heath and they went to work at Mike's Fabricating. When they arrived at work, Gomer and Heath went through the dumpster where Gomer had seen Kelley throwing trash bags. Inside one of the trash bags that Kelley had thrown away, Gomer found a woman's shirt and a boot. At that point, Gomer telephoned emergency 911.
Law-enforcement officers and the forensic team responded to the 911 call. The forensic team found the five trash bags with blue ties that Gomer had seen Kelley throw in the dumpster. Inside the bags, they found, among other things, the clothes Emily had been wearing at the club, her sunglasses, her necklace, and her driver's licence. They also found various other male and female clothes and washcloths. Many of these items had red/brown stains on them. The officers also found a sleeping bag with red/brown stains and a toilet plunger with red/brown stains on the handle. DNA testing revealed that the stains on the sleeping bag and toilet plunger consisted of Emily's blood.
The autopsy performed on Emily's body by Dr. Valerie Green indicated that she had been tortured prior to her death. She had a bruise and skin tears around her right eye consistent with being punched. She had cuts on her head and ear, a bruised lip, and multiple brain hemorrhages. Her neck was scratched and bruised and she had multiple bruises on her chest and back. Her legs and arms, including her wrists, were bruised. Emily had multiple cuts and bruises in her vagina. She also had multiple cuts and bruises around and in her anus and rectum, including a cut in the rectal lining located five to five and a quarter inches from the anal opening. Dr. Green testified that the injuries to Emily's genital area were consistent with being caused by the toilet plunger that Kelley had thrown away. She further determined that Emily was alive when her injuries were sustained and that her injuries would have been extremely painful. Dr. Green determined that Emily's death was caused by asphyxia resulting from strangulation.
Standard of Review
Because Kelley has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for "plain error." Rule 45A states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
" ' "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's 'substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." ' Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) ). In United States v. Young, 470 U.S. 1, 15 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
" 'The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," United States v. Frady, 456 U.S. 152, 163 (1982), those errors that "seriously affect the fairness, *1041 integrity or public reputation of judicial proceedings," United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." United States v. Frady, 456 U.S., at 163, n. 14.'
"See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would 'seriously affect the fairness or integrity of the judicial proceedings,' and that the plain-error doctrine is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result' (internal quotation marks omitted))."
11 So.3d at 938. "The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal." Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although Kelley's failure to object at trial will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State , 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).
I.
Kelley first argues that the evidence found during the search of his mobile home should have been suppressed because the affidavit submitted in support of the search warrant failed to establish probable cause that evidence of Emily's murder would be located in the mobile home. According to Kelley, because the affidavit in support of the search warrant was deficient, the circuit court abused its discretion by failing to apply the exclusionary rule of the Fourth Amendment. The State concedes that the affidavit in support of the search warrant was deficient but argues that the evidence collected in the mobile home was properly admitted under the good-faith and the inevitable-discovery exceptions to the exclusionary rule.
This Court agrees with the State that the evidence collected from Kelley's mobile home was admissible under the inevitable-discovery exception to the exclusionary rule.
"The Fourth Amendment to the United States Constitution provides, in pertinent part, that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation.' Thus, '[a] search warrant may only be issued upon a showing of probable cause that evidence or instrumentalities of a crime or contraband will be found in the place to be searched.' United States v. Gettel, 474 F.3d 1081, 1086 (8th Cir.2007)."
Ex parte Green, 15 So.3d 489, 492 (Ala.2008).
The Supreme Court of the United States has explained that "[t]he exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....' " United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (quoting U.S. Const. Amend. IV ). "Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." Calandra, 414 U.S. at 347 (citing Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and *1042 Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ). The Supreme Court, however, has created exceptions to the exclusionary rule, such as the inevitable-discovery exception. See Nix v. Williams , 467 U.S. 431, 441-48, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
"Under this exception, a court may admit illegally obtained evidence if the evidence inevitably would have been discovered through independent, lawful means." Kabat v. State, 867 So.2d 1153, 1156 (Ala.Crim.App.2003) (citations and quotations omitted). There are multiple ways to establish that evidence illegally seized is admissible under the inevitable-discovery exception. For instance, in Kabat, 867 So.2d at 1157, this Court held that evidence that was improperly discovered and seized through information obtained during the defendant's involuntary statement would be admissible under the inevitable-discovery exception if the State could establish by a preponderance of the evidence:
"(1) that there is a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police, before the misconduct, were actively pursuing the alternative line of investigation."
In circumstances where evidence was seized pursuant to an illegal, warrantless search, the United States Court of Appeals for the 11th Circuit has held that to "establish inevitable discovery[,] the prosecution must show that the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred." United States v. Khoury, 901 F.2d 948, 960 (11th Cir.1990) (citations omitted). The State may also establish that the inevitable-discovery exception applies by proving that the illegally obtained "evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." State v. Johnson, 340 Or. 319, 326-327, 131 P.3d 173, 179 (2006) (citation and quotations omitted). Under this method, "the state must show, by a preponderance of the evidence: (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." 340 Or. at 326-27, 131 P.3d at 179. The State may also establish that the inevitable-discovery exception applies by presenting evidence that a third party would have discovered the evidence and presented it to the police. See Adams v. State , 955 So.2d 1037, 1085 (Ala.Crim.App.2003) (" '[T]he doctrine should be applicable where the inevitable discovery would have come through the efforts of a private party who then would have presented the evidence to the police.' Wayne R. LaFave et al., Criminal Procedure § 9.3(e) at 353 (2d ed.1999). See United States v. Hernandez-Cano , 808 F.2d 779 (11th Cir.1987) (applied inevitable-discovery rule to discovery made by private party)."), reversed on other grounds, Ex parte Adams, 955 So.2d 1106 (Ala.2005). Ultimately, the inevitable-discovery exception applies if the State can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means...." Nix, 467 U.S. at 444.
Here, the State presented more than sufficient evidence to establish that the evidence discovered in Kelley's mobile home would inevitably have been discovered absent the invalid search warrant. The State's evidence showed that Kelley was the last person with Emily before her murder. Kelley, without being prompted, telephoned Detective Reaves to inquire about the investigation. Kelley lied to Detective Reaves and told her that he had dropped *1043 off Emily at the club before it closed. Detective Reaves determined that Kelley had lied about the events that occurred on the night Emily was murdered by reviewing surveillance videos taken at the club. Based on that information, law-enforcement officers were actively investigating Kelley.
Emily's body was found, battered and nude, in a wooded area where it had been dumped. Emily's body was covered with contusions and lacerations. Further, her genital area had been mutilated. Law-enforcement officers also learned that Kelley had abandoned the vehicle he recently had purchased. A search of the vehicle established the presence of blood, which was later determined to be Emily's blood. From these leads, law-enforcement officers would have had probable cause to believe that Kelley had murdered Emily. They also would have had cause to believe that the clothes Kelley was wearing on the night of the murder would probably be stained with Emily's blood and that the clothes and other blood evidence would probably be located inside Kelley's mobile home. Given that evidence, law-enforcement officers would have sought a valid search warrant. Thus, the evidence established that "the police possessed and were actively pursuing the lawful avenue of discovery when the illegality occurred." Khoury, 901 F.2d at 960.
Moreover, while officers were searching Kelley's mobile home, Gomer informed them that he had discovered women's clothing in the trash bags Kelley had thrown away. A search of the trash bags revealed bloody household items, such as a toilet plunger and a sleeping bag; bloody clothes, including the clothes Emily was wearing on the night she was murdered; and Emily's driver's license. Such evidence would have led law-enforcement officers to conclude that blood evidence would be found in Kelley's mobile home. Further, Detective Reaves sought, albeit improperly, to obtain a search warrant for Kelley's mobile home. From the facts that Detective Reaves sought a search warrant and law-enforcement officers had evidence indicating that Emily's blood would be found in Kelley's mobile home, the State presented evidence establishing that "certain proper and predictable investigatory procedures would have been utilized in the instant case, and ... that those procedures inevitably would have resulted in the discovery of the evidence in question." Johnson, 340 Or. at 326-27, 131 P.3d at 179. That is, even if the law-enforcement officers had "not performed the [initial search of Kelley's mobile home], they could have, and ultimately would have, produced an affidavit that established probable cause to search [Kelley's] residence for evidence...." Id.; see also State v. Taylor, 943 S.W.2d 675, 678 (Mo.Ct.App.1997) (holding that a evidence seized pursuant to an invalid search warrant was admissible because the information officers obtained from the search would inevitably have been discovered by a legitimate search warrant procured with information known to law enforcement), reversed on other grounds, State v. Taylor, 1 S.W.3d 610 (Mo.Ct.App.1999).
For the foregoing reasons, this Court holds that the State "establish[ed] by a preponderance of the evidence that the [evidence collected from Kelley's mobile home] ultimately or inevitably would have been discovered by lawful means...." Nix, 467 U.S. at 444. Therefore, the circuit court did not err by denying Kelley's motion to suppress.
II.
Kelley next argues that the State presented evidence relating to and commented on his post-arrest, post-Miranda [4] *1044 silence in violation of the Supreme Court of the United States' holding in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The State, on the other hand, argues that Kelley's testimony at trial opened the door to any Doyle violation and, alternatively, that any Doyle violation was harmless. Kelley did not object to the State's questions or comments at trial; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
Kelley was arrested in California. When law-enforcement officers from Alabama arrived in California to execute an arrest warrant, Detective Reaves read Kelley the Miranda warnings, and Kelley invoked his right to counsel.
Later, at trial, Kelley testified in his defense. According to Kelley, he was driving Emily back to the club when they encountered two men, Salvador and Danyo, with whom he had worked at C & B Piping. Kelley stated that he, Emily, Salvador, and Danyo then went back to his mobile home. Kelley testified that at some point, he left Emily, Salvador, and Danyo at his mobile home and drove to Birmingham to buy cocaine. Kelley explained that when he returned, he did not see anyone at his mobile home, and he passed out. When he awakened the next day, he found Emily's body in the mobile home. Kelley then went to Salvador and Danyo's apartment and had a conversation with them. Afterwards, he went back to his mobile home, got Emily's body, and dumped her body in the area where it was later found.
During his direct examination, defense counsel asked Kelley: "[P]rior to this week, mid part of this week, have you told anybody at all this story?" (R. 837.) Kelley stated that he had not. Counsel then asked Kelley why he had not told his story before. Kelley responded that he "was scared for [his] family, what would happen to them." (R. 837.)
During cross-examination, the prosecutor sought to impeach Kelley's testimony as follows:
"Q. You did talk to Detective Sergeant Reaves twice on the phone?
"A. Yes.
"....
"Q. And you talked-you were in the presence of Sergeant Reaves out in California out in Los Angeles?
"A. Yes sir.
"Q. And in fact Chief Cook with the Leeds Police Department?
"A. Yes sir.
"Q. And you were taken into custody in Los Angeles?
"A. Yes sir.
"Q. How many officers took you into custody?
"A. Roughly six to eight.
"Q. Do you remember Davey Schilaci; do you remember that name?
"A. No, no.
"Q. Do you know Captain Billy Murray, Investigator Billy Murray with the St. Clair County Sheriffs Office[?]
"A. Yes sir.
"Q. And Randy Hurst. Do you know Randy?
"A. No.
"Q. How did you get back to St. Clair County?
"A. Investigator Billy Murray brought me back and it was a-
"Q. And another investigator with the sheriff's department?
"A. It was a deputy, as far as I recall.
"Q. All right. So you spoke or had an opportunity to speak with Detective Sergeant Reaves three times. And *1045 there's at least six to eight officers out in Los Angeles?
"A. Yeah.
"Q. And how long did it take y'all to get back from Los Angeles to St. Clair County?
"A. Two days.
"Q. Two days with Investigator Murray at the time, now Captain Murray, and another deputy?
"A. Yes.
"Q. And the very first time you have ever told this story that you just told this jury to a law enforcement official is when?
"A. The first time? Ask it again.
"Q. When is the first time you told this story to any law enforcement official?
"A. I didn't.
"Q. Other than if you count today, your testimony, and Sergeant Reaves sitting here; is that right?
"A. Yeah.
"[Q.] And in fact, when you went to Salvador [and] Danyo's apartment isn't true that you drove right by the Leeds Police Department?
"A. Yeah.
"Q. When you drove there and you left there you went by the Leeds Police Department twice?
"A. Yes.
"Q. Didn't stop and tell anybody that?
"A. No.
"Q. Okay. And I believe you you did speak with a Moody police officer?
"A. Yes.
"Q. About Will?
"A. Yes.
"Q. Because he made some threats because Emily was missing?
"A. Yes.
"Q. And you wanted to make a police report about that?
"A. Yes sir.
"Q. But not about the dead body in your trailer?
"A. No.
"Q. Because you never told this story to law enforcement?
"A. No sir.
"Q. When is the first time that you told anybody the story that you just told this jury?
"A. A couple of days ago."
(R. 846-49.)
During defense counsel's closing argument, he recounted Kelley's testimony. Defense counsel then explained why Kelley had not told anyone his story:
"And then we come to the reason why did he not say anything? Why did he wait until this week? Why did he wait to this week to say. When he had that conversation with them two [Kelley] has a mother, a dad, a son, and a daughter. He does not live a perfect life, he has not lived the life he should have lived. And when he takes threats to them, he keeps his mouth shut. He does not want one of his family members to be hurt. It has eat at him and eat at him because he has known Emily since something when he was young. It has eat at him and eat at him. So finally Tuesday he has got to tell somebody. He has got to tell somebody; and he did."
(R. 901.)
In response, the prosecutor argued:
"And then lo and behold, after this trial starts and there's testimony and the defendant has had nineteen months to think about it, a little over 630 days, knowing what the evidence is going to be, he comes up with this story today, or Tuesday afternoon. The first time he ever told anybody. And [the court] is going to tell you, you can take into account *1046 any bias or interest a witness may have. And in this case the defendant is a witness. So what would he have to gain from that? He had ample opportunity, had this story been true, to tell this story to law enforcement. He spoke with Sergeant Reaves twice on the phone. He saw her once in person out in Los Angeles. He drove back with two deputies, two investigators with the Sheriffs Department. Spoke to several law enforcement officials in Los Angeles. But Will Lloyd comes to his house and we call the Moody Police Department knowing that there has been a dead body in our trailer, and we don't tell anybody. That makes absolutely no sense. Okay. Absolutely no sense."
(R. 905-06.)
This Court has explained that " ' [u]nder Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the prosecution may not use the post-arrest, post- Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), silence of a defendant as evidence of his guilt.' " Qualls v. State, 927 So.2d 852, 855-856 (Ala.Crim.App.2005) (quoting Burell v. State, 680 So.2d 975, 980 (Ala.Crim.App.1996) ). This Court further explained:
" ' "[W]hile it is true that the Miranda[ v. Arizona, 384 U.S. 436 (1966),] warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." ' "
Qualls, 927 So.2d at 856 (quoting Burell, 680 So.2d at 980, quoting in turn Doyle, 426 U.S. at 618 ). Doyle, of course, "forbids only comment upon a defendant's ... post-Miranda silence.... There is no prohibition against comment on a defendant's pre-arrest, pre-Miranda silence." Kidd v. State, 649 So.2d 1304, 1307 (Ala.Crim.App.1994) (citations and quotations omitted). Further, this Court has explained that a Doyle violation is subject to harmless-error analysis and such a determination must "be made on a case-by-case basis under the specific facts of each case." Qualls, 927 So.2d at 856.
Assuming without deciding that a Doyle violation occurred, any error was harmless and did not rise to the level of plain error. Rule 45A, Ala. R.App. P. The jury was well aware of the fact that Kelley had had numerous contacts with law-enforcement officers. Defense counsel elicited testimony establishing that Kelley did not tell his story until trial. Therefore, defense counsel elicited testimony establishing that Kelley did not tell his story to law-enforcement officers. Accordingly, the testimony elicited and the comments made by the prosecutor were cumulative to evidence properly admitted by defense counsel. See McNabb v. State , 887 So.2d 929, 971 (Ala.Crim.App.2001) (recognizing that "testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred" (citations and quotations omitted)); Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995) (holding that "[t]he erroneous admission of evidence that is merely cumulative is harmless error" (citing Reese v. City of Dothan, 642 So.2d 511 (Ala.Crim.App.1993) )). Further, the jury was never informed that Kelley had invoked his right to remain silent. Rather, many of the prosecutor's questions and statements related to Kelley's failure to tell his story on the multiple occasions he had conversations with law-enforcement officers before his arrest and before he invoked his Miranda rights. See Kidd , 649 So.2d at 1307 ("There is no prohibition against comment on a defendant's pre-arrest, pre-Miranda *1047 silence."). Accordingly, the jury did not know that Kelley had invoked his right to remain silent, but was well aware, through admissible evidence, that he had not informed law-enforcement officers of his story. Finally, the State presented an ironclad case of guilt, including DNA evidence of a bloodstain containing both Emily and Kelley's DNA. See Ex parte Greathouse , 624 So.2d 208, 211 (Ala.1993) (holding that because the evidence of guilt was "virtually ironclad," an erroneous comment on the defendant's failure to testify "did not affect the outcome of the trial or otherwise prejudice [the defendant's] right to a fair trial"); Ex parte Price, 725 So.2d 1063, 1072 (Ala.1998) ("Because the State produced overwhelming evidence, beyond Sheriff Turner's testimony concerning [Price's] statement, connecting Price to the crimes, we conclude that the error in allowing Sheriff Turner to testify regarding the statement did not rise to the level of plain error." (citations omitted)); Ex parte T.D.T., 745 So.2d 899, 906 (Ala.1999) (the erroneous admission of an out-of-court statement "was harmless error because, even without it, the record contain[ed] overwhelming evidence of [the defendant's] guilt" (citations omitted)).
Based on the foregoing reasons, this Court holds that any Doyle violation was harmless and did not affect the jury's deliberations. Ex parte Brown, 11 So.3d at 938 (holding that to constitute plain error, an error must have had an unfair, prejudicial impact on the jury's deliberations (quoting Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) )). Therefore, the error, if any, did not rise to the level of plain error, and Kelley is not entitled to any relief. Rule 45A, Ala. R.App. P.
III.
Kelley next argues that the State presented insufficient evidence to sustain his conviction for murder made capital because it was committed during a kidnapping. Specifically, Kelley argues that the State failed to present any evidence indicating that he abducted Emily, a necessary element of kidnapping. From there, Kelley asserts that his conviction for capital murder/kidnapping must be reversed. Kelley also argues that, because murder/kidnapping was also an aggravating circumstance relied upon in sentencing him to death, his death sentence must be reversed. This Court disagrees.
"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution." Powe v. State, 597 So.2d 721, 724 (Ala.1991) (citing Faircloth v. State, 471 So.2d 485 (Ala.Crim.App.1984) ). " 'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.' " Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997) (quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992) ). "When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision." Sale v. State, 8 So.3d 330, 338 (Ala.Crim.App.2008) (quotations and citations omitted). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Stewart, 900 So.2d 475, 477 (Ala.2004) (citations and quotations omitted).
*1048 Section 13A-5-40(a)(1), Ala.Code 1975, provides, in relevant part, that "[m]urder by the defendant during a kidnapping in the first degree or an attempt thereof" is capital murder. "A person commits the crime of kidnapping in the first degree if he abducts another person with intent to ... [i]nflict physical injury upon him, or to violate or abuse him sexually...." § 13A-6-43(a)(4), Ala.Code 1975. Abduct is defined as "[t]o restrain a person with intent to prevent his liberation by either ... [s]ecreting or holding him in a place where he is not likely to be found, or ... [u]sing or threatening to use deadly physical force." § 13A-6-40(2), Ala.Code 1975. Restrain is defined as follows:
"(1) RESTRAIN. To intentionally or knowingly restrict a person's movements unlawfully and without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved. Restraint is 'without consent' if it is accomplished by:
"a. Physical force, intimidation or deception...."
§ 13A-6-40(1) a., Ala.Code 1975.
Here, the State presented evidence that Emily agreed to leave the club and to go with Kelley to Heath's house. Emily told her friends that she would be back in 20 minutes. Although Kelley drove Emily to Heath's house, he also took her to his own mobile home. The State's evidence indicated that, once at the mobile home, Kelley viciously attacked Emily, hitting her in the eye and beating her so as to cause contusions and lacerations all over her body. The State presented evidence that blood was located on multiple walls and in multiple rooms in Kelley's mobile home indicating that Emily was moving about the mobile home in an attempt to escape from Kelley while being attacked. Dr. Green testified that the blows to Emily's head were insufficient to render her unconscious. The State also presented evidence indicating that Kelley forced the handle of a toilet plunger into Emily's rectum and vagina causing severely painful lacerations. The State's evidence indicated that Kelley then murdered Emily by strangling her to death.
The fact that Emily initially went with Kelley voluntarily does not negate the State's evidence indicating that she was abducted. See Duncan v. State , 827 So.2d 838, 843 (Ala.Crim.App.1999) ("Merely because the victim initially agreed to accompany the individuals does not negate the fact that she was later forcibly confined."). Rather, the State's evidence indicated that Kelley attacked, stripped nude, and tortured Emily in his mobile home while she tried to get away from him. From that evidence, the jury could have reasonably inferred that Kelley restrained Emily by "intentionally or knowingly restrict [ing] [her] movements unlawfully and without [her] consent, so as to interfere substantially with [her] liberty ... by confining [her] ... in [his mobile home] by physical force." § 13A-6-40(1) a., Ala.Code 1975. Further, the State presented evidence indicating that Kelley abducted Emily by restraining her with the "intent to prevent her liberation by ... holding [her] in [his mobile home] where [she] is not likely to be found [and] ... [by] ... [u]sing ... deadly physical force[, i.e., strangling her to death]." §§ 13A-6-40(2) a., 13A-6-40(2)b., Ala.Code 1975. Finally, the State presented evidence indicating that Kelley abducted Emily with the intent to ... [i]nflict physical injury upon [Emily], or to violate or abuse [her] sexually" when it presented evidence indicating that Kelley attacked Emily, violated her sexually with a toilet plunger, and then strangled her to death. § 13A-6-43(a)(4), Ala.Code 1975. Consequently, the State presented evidence *1049 sufficient to establish that Kelley murdered Emily during the course of a first-degree kidnapping, and Kelley is not entitled to any relief on this issue.
IV.
Kelley next argues that the circuit court abdicated its judicial role and allowed the State to admit any photographs it wanted to without making an individualized determination that those photographs were admissible. Kelley also argues that the record fails to show that the circuit court viewed the State's photographic evidence before allowing it to be admitted. Finally, he argues that the circuit court erroneously allowed the State to admit crime-scene and autopsy photographs that showed Emily's body after it had been disturbed by animals and insects. This Court disagrees.
A.
Kelley first argues that the circuit court erroneously refused to consider whether photographs were admissible before allowing them to be admitted into evidence. To support his argument, Kelley argues that the circuit court "announced" that it was "going to let every picture y'all want to put in, in." (Kelley's brief, at 56 (quoting R. 355.)) Kelley did not raise this argument at trial; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
Kelley's argument is refuted by the record and thus without merit. See Albarran v. State , 96 So.3d 131, 160 (Ala.Crim.App.2011) (recognizing that claims that are refuted by the record are without merit); McNabb v. State, 991 So.2d 313, 320 (Ala.Crim.App.2007) (holding that a claim that is refuted by the record is without merit and does not entitle an appellant to relief). At trial, defense counsel sought to admit a photograph of Emily and Lloyd on the night of the murder in which they were making hand gestures. The State objected to the admission of the photograph. In overruling the State's objection, the circuit court stated:
"I understand what you're saying and I'm going to overrule. I'm going to let the picture in. I'm going to let every picture y'all want to put in, in."
(R. 355.) The prosecutor responded, "Oh really." Id.
Contrary to Kelley's assertion, the circuit court did not announce that it was going to refuse to consider the admissibility of photographs that the State sought to admit into evidence. Rather, the circuit court announced that it was going to allow defense counsel to admit whatever photographs the defense sought to admit.
Further, the record establishes that the circuit court did not refuse to consider the admissibility of the State's photographic evidence. For instance, when the State sought to admit a diagram prepared by Dr. Green depicting the injuries Emily suffered, the following occurred:
"[THE STATE]: Judge, we move to admit State's 112.
"THE COURT: Any objection?
"[DEFENSE COUNSEL]: Yes sir.
"(Side bar at the bench.)
"[DEFENSE COUNSEL]: The witness offered detailed testimony of what is represented on these drawings. These drawings would be useful for incensing the feelings of the jury and add nothing probative to the case and they are extremely prejudicial to the defendant.
"THE COURT: Response.
"[THE STATE]: The diagrams plus photographs are relevant to show the injuries that occurred. And I think that is how the body appeared and how she saw the body at the time of the autopsy.
*1050 "THE COURT: I'm going to let it in. I wanted to hear what your objection is."
(R. 752.) Later, when the State sought to admit photographs of Emily during the autopsy, the following occurred:
"[THE STATE]: The State moves to admit Exhibit 83.
"[DEFENSE COUNSEL]: May we approach?
"THE COURT: Sure, absolutely.
"(Side bar held out of the hearing of the jury.)
"[DEFENSE COUNSEL]: As to each of these photographs we would like to make the same objection we did to the drawings; that is they wouldn't be probative and they would be highly prejudice to the defendant and nothing is going to be added by offering these to the jury.
"THE COURT: I understand and I am overruling. And you have a standing objection."
(R. 760-61.)
As the record shows, the circuit court did not abdicate its duty to review the admissibility of photographs admitted into evidence by the State. Rather, the circuit court considered the objections raised by defense counsel and overruled those objections. Consequently, Kelley's argument is refuted by the record, and no error, much less plain error, occurred. See Albarran , 96 So.3d at 160 ; McNabb, 991 So.2d at 320.
B.
Kelley also asserts, in a one-sentence sub-argument, that "there is no evidence that the trial court even saw the pictures the State presented to the jury before the jurors did." (Kelley's brief, at 57.) This Court notes that there is also no indication in the record that the circuit court did not look at the photographs before it allowed their admission. This Court will not find plain error based on a silent record. See Ex parte Walker , 972 So.2d 737, 752 (Ala.2007) (recognizing that to rise to the level of plain error, the error must be "obvious on the face of the record"). Therefore, this issue does not entitle Kelley to any relief.
C.
Kelley next argues that the circuit court abused its discretion by allowing the State to admit autopsy photographs that showed that an animal and insects had altered Emily's body after her death. Specifically, Kelley argues that the circuit court erroneously allowed the State to admit photographs showing that part of Emily's nose was missing as a result of animal activity and showing that flies had laid eggs in her genital area. He further argues that the State improperly admitted testimony regarding the postmortem animal and insect activity. According to Kelley, the photographs and testimony regarding postmortem animal and insect activity were unduly gruesome, irrelevant, and prejudicial. This Court disagrees.
This Court has repeatedly held:
" 'Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge." ' Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993), quoting Magwood v. State, 494 So.2d 124, 141 (Ala.Crim.App.1985), aff'd, *1051 494 So.2d 154 (Ala.1986). 'Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.' Williams v. State, 506 So.2d 368, 371 (Ala.Crim.App.1986) (citations omitted). In addition, 'photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ' "[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter." ' Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 851 So.2d 453 (Ala.2002). 'The same rule applies for videotapes as for photographs: "The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury." ' Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982). See also Ward v. State , 814 So.2d 899 (Ala.Crim.App.2000). Generally, '[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence' and 'is admissible over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative.' Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). 'Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.' Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986)."
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
This Court has reviewed the autopsy photographs and testimony relating to the postmortem animal and insect activity. The photographs were relevant and admissible to establish the injuries Kelley inflicted on Emily. The photographs and testimony relating to postmortem animal and insect activity was also relevant and admissible to distinguish between the injuries Kelley caused and the injuries that he did not. Further, although the photographs and the testimony were certainly unpleasant, they were not unduly gruesome or unfairly prejudicial. Consequently, this Court concludes that their prejudicial effect did not outweigh their probative value. As such, no error resulted from the admission of the photographs and testimony relating to postmortem animal and insect activity. See Gissendanner v. State , 949 So.2d 956, 969-72 (Ala.Crim.App.2006) (holding that the circuit court did not abuse its discretion by allowing the State to admit a 14-minute video depicting the victims decomposing body).
V.
Kelley next argues that the circuit court erroneously allowed the State to present evidence that he was included as a possible donor in relation to a mixed DNA sample found in Kelley's mobile home. Specifically, Kelley argues that the circuit court erroneously allowed Torey Williams, an expert in DNA analysis with the Alabama Department of Forensic Sciences ("DFS"), to testify that Kelley was included as a possible donor to the mixture sample without requiring Williams to provide *1052 population-frequency statistics. According to Kelley, without population-frequency statistics, the testimony relating to him being a possible donor to the mixture sample was unreliable and irrelevant. Kelley did not object to Williams's testimony at trial; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
Williams tested 15 samples of blood collected from Kelley's mobile home, his vehicle, and items Kelley threw in the dumpster, and he determined that the blood contained Emily's DNA. According to Williams, the profile that he detected on the samples would appear in one in 36 trillion Caucasian individuals and one in 55 trillion African-American individuals. Williams also testified that he tested a mixture sample. Williams explained that the major component of the mixture was consistent with Emily's DNA. He further testified that Kelley was included as a possible donor to the minor component. Williams did not testify regarding population-frequency statistics for the probabilities that Emily or Kelley were donors to the mixture sample.
In Turner v. State, 924 So.2d 737, 765-66 (Ala.Crim.App.2002), this Court recognized that population-frequency statistics on mixture samples are unreliable and generally not performed. This Court then rejected Turner's argument that the trial court erroneously allowed the admission of evidence establishing that he was a possible donor to a mixture sample without requiring the State to present population-frequency statistical information. Id. at 764-66. Kelley acknowledges this Court's decision in Turner but argues that Turner"is outdated and inapplicable here [because] population-frequency statistics are now routinely and reliably calculated for mixed DNA samples." (Kelley's brief, at 70 n. 29.) Specifically, Kelley argues that this Court's holding in Turner should be overruled because advances in DNA testing have rendered it inapplicable.
Whether advances in DNA testing have rendered population-frequency statistics on mixed DNA samples reliable, thus requiring the admission of such evidence along with DNA testimony, is an issue of first impression in this State. It is well settled that plain-error review is an inappropriate mechanism to decide issues of first impression or to effectuate changes in the law.[5] See United States v. Olano , 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (a "court of appeals cannot correct an error [under the plain-error doctrine] unless the error is clear under current law"); United States v. Madden, 733 F.3d 1314, 1322 (11th Cir.2013) ("For a plain error to have occurred, the error must be one that is obvious and is clear under current law.") (citations and quotations omitted); United States v. Accardi, 669 F.3d 340, 348 (D.C.Cir.2012) ("[A] question of first impression ... would be inappropriate to address under plain error review."); United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir.2003) ("[T]here can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it.") (citations omitted); United States v. Magluta, 198 F.3d 1265, 1280 (11th Cir.1999) ("a district court's error is not 'plain' or 'obvious' if there is no precedent directly resolving an issue"), vacated in part on *1053 unrelated grounds, 203 F.3d 1304 (11th Cir.2000). Kelley's argument that this Court should change the law and hold, for the first time, that the State must admit population-frequency statistics in conjunction with DNA testimony relating to mixed samples is an issue of first impression and thus not properly before this Court for plain-error review. United States v. Accardi, 669 F.3d at 348. Rather, under the current law, the circuit court's failure to require the State to admit population-frequency statistics in conjunction with DNA evidence including Kelley as a possible donor to the mixed samples was not error and thus not plain error.[6] See Turner , 924 So.2d at 765-66.
VI.
Kelley next argues that the State exercised its peremptory challenges in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, Kelley argues that the State used 3 of its 18 peremptory challenges to remove all qualified African-Americans from the jury. Kelley asserts that the three African-American veniremembers struck by the State, J.A., T.C., and C.J., were "as heterogeneous as the community as a whole." (Kelley's brief, at 73.) He further alleges that the State treated African-American veniremembers and white veniremembers differently. Kelley did not raise a Batson objection at trial; therefore, this Court reviews this issue for plain error only. Rule 45A, Ala. R.App. P.
"To find plain error in the context of a Batson or J.E.B. [ v. Alabama, 511 U.S. 127 (1994),] violation, the record must supply an inference that the prosecutor was 'engaged in the practice of purposeful discrimination.' " Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (quoting Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987) ). See also Saunders v. State , 10 So.3d 53, 78 (Ala.Crim.App.2007) ("For an appellate court to find plain error in the Batson [or J.E.B. ] context, the court must find that the record raises an inference of purposeful discrimination by the State in the exercise of peremptory challenges."). In evaluating a Batson or J.E.B. claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) :
"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [ Batson v. Kentucky,] 476 U.S. [79,] 96-97 [(1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98 [106 S.Ct. 1712 ]."
537 U.S. at 328-29.
With respect to the first step of the process-the step at issue here-"[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination." Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala.1987) ). "A defendant *1054 makes out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' surrounding a prosecutor's conduct during the defendant's trial." Lewis v. State, 24 So.3d 480, 489 (Ala.Crim.App.2006) (quoting Batson, 476 U.S. at 94, aff'd, 24 So.3d 540 (Ala.2009) ). "In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination." Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of "relevant circumstances" to consider in determining whether a prima facie case of race discrimination has been established:
"The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
"1. Evidence that the 'jurors in question share[d] only this one characteristic-their membership in the group-and that in all other respects they [were] as heterogeneous as the community as a whole.' [ People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [ (1978) ]. For instance 'it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
"2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson [ v. Kentucky] , 476 U.S. [79,] 97, 106 S.Ct. [1712] 1723 [ (1986) ].
"3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain[ v. Alabama, 380 U.S. 202 (1965) ].
"4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723 ; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
"5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987) ; People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986) ; People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
"6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
"7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721 ; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049 [ (1976) ].
"9. The state used peremptory challenges to dismiss all or most black jurors.
*1055 See Slappy, 503 So.2d at 354, Turner, supra."
Id. at 622-23.
Applying the factors established in Branch, this Court holds that the record does not raise an inference of racial discrimination. Initially, this Court notes that both the defendant and the victim in this case were white, and the facts of the case do not indicate that the race of the jurors would be a concern. Further, there is no indication in the record that the prosecutor has a history of racial discrimination. The record does not show a pattern in the manner in which the State struck African-Americans. There were no apparent differences in the manner in which African-Americans and whites were questioned. That is, the type and manner of questions directed to jurors appeared to be uniform. There was no disparate examination of African-American veniremembers, and the State did not ask questions designed to provoke disqualifying responses from African-Americans.
Further, the record does not indicate that the three African-Americans struck by the State were heterogeneous as the community as a whole or were treated differently than whites. First, veniremember J.A. indicated that he had been convicted of theft, a crime of moral turpitude. No one who served on Kelley's jury had been convicted of a crime of moral turpitude. Cf. Welch v. State , 63 So.3d 1275, 1283 (Ala.Crim.App.2010) (recognizing that the State may take into account a veniremember's criminal history when striking a jury). Therefore, veniremember J.A. was not similarly situated with the jurors who served on Kelley's jury.
Next, veniremember T.C. informed the court that he would not recommend a sentence of death unless the State produced "strong hard evidence." (R. 123.) No one who served on Kelley's jury indicated that they would require "strong hard evidence" before they could recommend a sentence of death. Cf. Blanton v. State, 886 So.2d 850, 874 (Ala.Crim.App.2003) (recognizing that the State may take into account the burden of proof a veniremember will place on it when striking a jury). Kelley points to the fact that a number of jurors who served on his jury said that they would want or would require DNA evidence before they would recommend a sentence of death. From there, Kelley argues that veniremember T.C. was similarly situated with the jurors who wanted DNA before they would recommend a sentence of death. This Court disagrees. The State was well aware of the fact that it would admit large amounts of DNA evidence, including DNA evidence establishing that Emily's blood was in Kelley's vehicle, in his mobile home, and on items he had thrown away. As such, jurors whose answers insinuated that DNA evidence would sway them toward recommending a sentence of death would be sought by the State. The State would be concerned, however, with a veniremember who indicated that he or she may require a higher evidentiary standard than is required under the law for a recommendation of death. Accordingly, veniremember T.C. was not similarly situated with jurors who served on Kelley's jury.
Finally, veniremember C.J. indicated on her juror questionnaire that she would not recommend a sentence of death under any circumstance. Hyde v. State, 778 So.2d 199, 223 (Ala.Crim.App.1998) (reservations about the death penalty constituted a race-neutral ground for a peremptory strike). In her juror questionnaire and during voir dire, though, veniremember C.J. indicated that she could recommend a sentence of death. However, the fact that a potential juror vacillates on being able to impose the death penalty is a valid concern for the State to consider when selecting a jury. Cf.
*1056 Floyd v. State , 190 So.3d 987, 994 (Ala.Crim.App.2012) (holding that a veniremember's vacillation on the imposition of the death penalty is a valid reason to exercise a peremptory challenge). No one who served on Kelley's jury had vacillated on whether they could impose a sentence of death; therefore, veniremember C.J. was not similarly situated to the members of Kelley's jury.
In sum, there is no indication in the record that the State used its peremptory challenges to discriminate based on race. Therefore, this Court holds that the circuit court did not err by failing to sua sponte require the State to give its reasons for striking veniremembers J.A., T.C., and C.J. Consequently, this issue does not rise to the level of plain error or entitle Kelley to any relief. Rule 45A, Ala. R.App. P.
VII.
Kelley next argues that the circuit court's penalty-phase instructions regarding the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975, were improper. Specifically, Kelley argues that the circuit court improperly failed to inform the jury that to find his crime " 'excessively heinous,' or 'excessively atrocious,' or 'excessively cruel,' they must also find that the crime was 'conscienceless or pitiless' and 'unnecessarily torturous to the victim.' Ex parte Key, 891 So.2d 384, 389 (Ala.2004)." (Kelley's brief, at 82-83.) He next argues that the circuit court's instructions unconstitutionally failed to inform the jury that its determination that an aggravating circumstance existed must be unanimous. (Kelley's brief, at 88.) Finally, he argues that the circuit court's instructions were "hopelessly confusing." (Kelley's brief, at 86.) Kelley did not object to the circuit court's instructions; therefore, this Court reviews these issues for plain error only. Rule 45A, Ala. R.App. P.
In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), this Court explained:
" 'A trial court has broad discretion when formulating its jury instructions. See Williams v. State , 611 So.2d 1119, 1123 (Ala.Crim.App.1992). When reviewing a trial court's instructions, " 'the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.' " Self v. State, 620 So.2d 110, 113 (Ala.Crim.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Crim.App.1987) ); see also Beard v. State , 612 So.2d 1335 (Ala.Crim.App.1992) ; Alexander v. State, 601 So.2d 1130 (Ala.Crim.App.1992).'
" Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001). 'The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice.' Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."
868 So.2d at 1161-62.
At the conclusion of the penalty phase, the circuit court instructed the jury regarding the especially heinous, atrocious, or cruel aggravating circumstance as follows:
"The other aggravating circumstance that the State is asking you to consider, and this one it is your duty, it is the burden on the State to prove this to you beyond a reasonable doubt, and that is that this capital offense was especially heinous, atrocious or cruel as compared to other capital offenses. The term heinous means extremely wicked or shockingly *1057 evil. The term atrocious means outrageously wicked or violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others. What is indicated, and what is intended to be included in this aggravating circumstances is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses. For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in a capital offense. For a capital offense to be especially cruel it must be [conscienceless] or a pitiless crime which is unnecessarily torturous to the victim. Ladies and gentlemen, all capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness or cruelty exceeds those that will always exist when a capital offense is committed. You may consider this if you are convinced beyond a reasonable doubt based on the evidence that such a circumstance does exist. The fact that I instruct you on such an aggravating circumstance or define it for you does not mean this circumstance has been proved beyond a reasonable doubt in this matter. Whether the aggravating circumstance I instruct you on and define for you has been proven beyond a reasonable doubt based on the evidence is for you, the jury alone, to determine.
"As I have stated before the burden of proof is on the State to convince each of you beyond a reasonable doubt as to the existence of that particular aggravating circumstance, which you may consider in the punishment you recommend in this case. That means that before you even consider death you must be convinced beyond a reasonable doubt that at least one aggravating circumstance exists. But one does exist because you found it beyond a reasonable doubt when you returned your verdict.
"However; on the other one, on the especially heinous or atrocious, that aggravating circumstance can arise from all evidence that was a part of this case or lack of evidence, failure of evidence that was in this case.
"Again, it must be proven beyond a reasonable doubt to the extent of this particular case. And if on the part that is alleged especially cruel or heinous."
(R. 962-64; emphasis added.)
A.
Kelley first argues that a portion of the circuit court's instructions improperly allowed the jury to find that his crime was especially heinous, atrocious, or cruel without finding that the crime was conscienceless or pitiless and unnecessarily torturous to the victim. To support his argument, Kelley sites the following portion of the circuit court's instructions:
"For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in a capital offense. For a capital offense to be especially cruel it must be conscienceless or a pitiless crime which is unnecessarily torturous to the victim."
(R. 963.) Kelley argues that this portion of the circuit court's instructions improperly informed the jury that to find that his crime was " 'especially cruel' [it was] required to find that the offense was also 'conscienceless or pitiless' and 'unnecessarily torturous to the victim' "; however, the instructions allowed the jury to find that the crime was " 'especially heinous' " or " 'especially atrocious' " without finding that the crime was conscienceless or pitiless *1058 and unnecessarily torturous to the victim. (Kelley's brief, at 82-85.) According to Kelley, the circuit court's instructions allowed the jury to find that the especially heinous, atrocious, or cruel aggravating circumstance existed under an " 'especially heinous' " or an " 'especially atrocious' " theory if the jury determined that the "brutality which is involved in it [exceeded] that which is normally present in a capital offense," thus alleviating the necessity that the jury determine that the crime was unnecessarily torturous. (Kelley's brief, at 82-85.)
The especially heinous, atrocious, or cruel aggravating circumstance applies only to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981) (citing State v. Dixon, 283 So.2d 1 (Fla.1973) ), abrogated on other grounds, Ex parte Stephens, 982 So.2d 1148, 1152-53 (Ala.2006).
" 'There are three factors generally recognized as indicating that a capital offense is especially heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.' "
Saunders v. State, 10 So.3d 53, 108 (Ala.Crim.App.2007) (quoting Brooks v. State, 973 So.2d 380, 417-18 (Ala.Crim.App.2007), citing in turn Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999) ).
Here, the circuit court's instruction that "for a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in a capital offense" was nothing more than another way of explaining that the acts committed during the murder must fall within one of the factors establishing that the murder was unnecessarily torturous, i.e., that the acts resulting in death involved the infliction of violence beyond that necessary to cause death, involved suffering by the victim, or involved psychological torture. For that reason, this Court has held that identical jury "instructions on this issue were both thorough and accurate." Stallworth v. State, 868 So.2d 1128, 1168 (Ala.Crim.App.2001) (approving the circuit court's instruction that "[f]or a capital offense to be especially heinous or atrocious, any brutality involved in it must exceed that which is normally present in any capital offense [and] [f]or a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim"); Hall v. State, 820 So.2d 113, 147 (Ala.Crim.App.1999) ("commend[ing] the trial court for its thorough instruction on the definition of the term 'especially heinous, atrocious, or cruel' " where the trial court instructed the jury that for a capital offense to be especially heinous or atrocious, any brutality that is involved must exceed that which is normally present in any capital offense and for a capital offense to be especially cruel, it must be a conscienceless or a pitiless crime that is unnecessarily torturous to the victim); see also Broadnax v. State , 825 So.2d 134, 210 (Ala.Crim.App.2000) (approving the same instruction on the especially heinous, atrocious, or cruel aggravating circumstance). Because the circuit court, like the court in Stallworth, properly instructed the jury regarding the definition of the especially heinous, atrocious, or cruel aggravating circumstance, no error, much less plain error, occurred. Rule 45A, Ala. R.App. P.
B.
Kelley next argues that the circuit court's instructions regarding the especially heinous, atrocious, or cruel aggravating *1059 circumstance erroneously failed to inform the jury that it must unanimously find that circumstance to exist before the circumstance could be considered in determining the proper punishment. According to Kelley, because the circuit court failed to give a unanimity instruction, his sentence of death must be reversed. This Court disagrees.
In Hosch v. State , 155 So.3d 1048 (Ala.Crim.App.2013), this Court rejected the same argument under almost identical circumstances. Rejecting Hosch's argument that the circuit court's failure to use the word "unanimous" was reversible error, this Court held:
"The trial court repeatedly instructed the jury in accordance with the pattern jury instructions that the State had the burden to prove beyond a reasonable doubt the existence of an aggravating circumstance. The trial court also correctly instructed the jurors that, 'before you can recommend a death sentence, each of you must be convinced beyond a reasonable doubt that one or more aggravating circumstances exists.' (R. 1768.) Although the trial court did not use the word, 'unanimous,' the foregoing instruction adequately conveyed that meaning, and a reasonable juror would have interpreted the instruction to include a unanimity requirement for aggravating circumstances."
Id. at 1089.
Similarly, in Stewart v. State, 601 So.2d 491, 508 (Ala.Crim.App.1992), overruled on other grounds, Ex parte Gentry, 689 So.2d 916 (Ala.1996), this Court rejected an argument that the circuit court's failure to use the word "unanimous" required reversal of Stewart's sentence. In Stewart, the circuit court did not instruct the jury that it had to unanimously find the existence of an aggravating circumstance before the circumstance could be considered in deciding Stewart's punishment. The circuit court did, however, instruct the jury that "[t]he law of the State provides a list of aggravating circumstances which may be considered by a jury in recommending punishment, if the jury is convinced beyond a reasonable doubt and to a moral certainty from the evidence that one or more or any of such aggravating circumstances exist in this case." 601 So.2d at 507 (emphasis added). Rejecting Stewart's argument that the failure to use the word "unanimous" required reversal, this Court held:
"[The] court's use of the term 'the jury' implies that any findings of aggravating circumstances had to be unanimous. We must evaluate instructions like a reasonable juror may have interpreted them. See Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). No plain error occurred here."
Stewart, 601 So.2d at 508.
Here, although the circuit court did not use the word "unanimous," its jury instructions, as a whole, adequately conveyed to the jury that it must unanimously find the existence of the especially heinous, atrocious, or cruel aggravating circumstance before that circumstance could be considered in deciding what punishment to recommend. During its instructions, the circuit court repeatedly informed the jury that the State had the burden of proving beyond a reasonable doubt the existence of the especially heinous, atrocious, or cruel aggravating circumstance. Hosch, 155 So.3d at 1089-90. The circuit court instructed the jury that whether the especially heinous, atrocious, or cruel aggravating circumstance has been "proven beyond a reasonable doubt based on the evidence is for you, the jury alone, to determine." (R. 963.) See Stewart , 601 So.2d at 508. Further, the circuit court instructed the jury that the "burden of proof is on *1060 the State to convince each of you beyond a reasonable doubt as to the existence of that particular aggravating circumstance." (R. 963-64; emphasis added.)
As in Hosch and Stewart, the circuit court's instructions adequately conveyed to the jury that it must unanimously find the existence of the especially heinous, atrocious, or cruel aggravating circumstance before that circumstance could be considered in deciding what punishment to recommend. Accordingly, no error, much less plain error, occurred. Rule 45A, Ala. R.Crim. P.
C.
Kelley next argues that the circuit court's jury instructions relating to the especially heinous, atrocious, or cruel aggravating circumstance were "hopelessly confusing." (Kelley's brief, at 86.) To support his argument, Kelley points to the following comment by the circuit court: "Again, it must be proven beyond a reasonable doubt to the extent of this particular case. And if on the part that is alleged especially cruel or heinous." (Kelley's brief, at 87 (quoting R. 964.)) Kelley also directs this Court's attention to the following statement: " 'However, on the other one, on the especially heinous or atrocious, that aggravating circumstance can arise from all evidence that was a part of this case or lack of evidence, failure of evidence that was in this case.' " (Kelley's brief, at 87 (quoting R. 964.)) According to Kelley, these two statements by the circuit court rendered its instructions regarding the especially heinous, atrocious, or cruel aggravating circumstance unconstitutionally confusing. Although the two statements Kelley cites, read in isolation, are not a model of clarity, this Court must consider the court's instructions as a whole. Stallworth, 868 So.2d at 1161-62. This Court has reviewed the entire penalty-phase jury instructions and holds that the circuit "court's instructions as a whole adequately conveyed to the jury the proper" definition of the especially heinous, atrocious, or cruel aggravating circumstance; correctly explained that the burden was on the State to prove that aggravating circumstance beyond a reasonable doubt; and adequately informed the jury that its finding as to the existence of that aggravating circumstance must be unanimous. Lewis v. State, 889 So.2d 623, 656 (Ala.Crim.App.2003). Further, nothing in the circuit court's instructions "would have misled the jury" regarding how to properly make its sentencing determination. Id. Accordingly, no error, much less plain error, resulted from the circuit court's instructions regarding the especially heinous, atrocious, or cruel aggravating circumstance.
VIII.
Kelley next argues that prosecutorial misconduct during the State's penalty-phase closing arguments requires that his sentence be reversed. First, Kelley argues that the prosecutor improperly commented on his failure to testify and his presentation of an innocence defense in the guilt phase. Next, Kelley argues that the prosecutor improperly urged the jury to consider society's interest in executing him. Kelley did not object to the prosecutor's comments at trial; therefore, this Court reviews these issues for plain error only. Rule 45A, Ala. R.App. P.
Initially, this Court notes:
" ' "In judging a prosecutor's closing argument, the standard is whether the argument 'so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process.' " Bankhead [v. State ], 585 So.2d [97,] 107 [ (Ala.Crim.App.1989),] quoting *1061 Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 5[2] 8 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.'
" Ferguson v. State, 814 So.2d 925, 945-46 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). Moreover, ' "[t]his court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." ' Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991) (quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985) )."
Wilson v. State , 142 So.3d 732, 748 (Ala.Crim.App.2010) (opinion on return to remand).
A.
Kelley first argues that, during the State's rebuttal penalty-phase closing argument, the prosecutor improperly commented on his failure to testify and his presentation of an innocence defense in the guilt phase. To support his argument, Kelley points to the following statements by the prosecutor:
"We have been here since Tuesday with testimony and we have seen not one single ounce of remorse from Mr. Kelley. Not one.
"What have we seen? We had him get up here on the stand and come up with a story on Tuesday afternoon, basically to try and trick you. That's what we have seen."
(Kelley's brief, at 93.) According to Kelley, the prosecutor's comment that they had not seen a single ounce of remorse was an improper comment on Kelley's failure to testify during the penalty phase. He further argues that the comment relating to his guilt-phase testimony was improper. This Court disagrees.
First, the prosecutor's comment relating to his lack of remorse was not a comment on his failure to testify during the penalty phase. Rather, the prosecutor's comment related to Kelley's demeanor during his guilt-phase testimony and throughout the trial. This Court has held that " '[t]he conduct of the accused[,] the accused's demeanor during the trial[, and the accused's lack of remorse are] proper subject[s] of comment' " during the penalty phase. Thompson v. State , 153 So.3d 84, 175 (Ala.Crim.App.2012) (quoting Wherry v. State, 402 So.2d 1130, 1133 (Ala.Crim.App.1981) ). See also Ex parte Loggins , 771 So.2d 1093, 1101 (Ala.2000) (holding that "remorse is ... a proper subject of closing arguments"). Consequently, no error, much less plain error, resulted from the prosecutor's *1062 commenting on Kelley's lack of remorse.
Kelley also argues that the prosecutor's comment that he tried to trick the jury with his guilt-phase testimony was an "impermissible ... attempt to punish a capital defendant at the penalty phase for exercising his constitutional right to present an innocence defense at the guilt phase." (Kelley's brief, at 94.) It is not surprising that Kelley provides no authority for his proposition that the State may not comment during its penalty-phase closing argument on the evidence presented in the guilt phase. To the contrary, this Court has held that "[t]he conduct of the accused[,] the accused's demeanor during the trial[, and the accused's lack of remorse are] proper subject[s] of comment" ' during the penalty phase. Thompson, 153 So.3d at 175 (quoting Wherry, 402 So.2d at 1133 ). The conduct of the accused upon which the prosecutor may comment includes the accused's attempt to avoid responsibility for actions by testifying untruthfully. Therefore, no error, much less plain error, resulted from the prosecutor's comment.
B.
Kelley next argues that the prosecutor improperly urged the jury to consider the interest of society in executing him. To support his argument, Kelley cites the following statement by the prosecutor:
"[S]ociety as a whole has a right to self-defense. Okay. And you can send that message that as a society we have a right to self-defense, just like an individual does. And when you return your recommendation of death, you will be validating society's right to self-defense. Thank you."
(Kelley's brief, at 94 (quoting R. 960.)) According to Kelley, this comment was intended to inflame the jury's passions and it improperly injected a nonstatutory aggravating circumstance into the penalty phase. This Court disagrees.
The prosecutor's comment was not an attempt to inflame the jury's passion or to inject a nonstatutory aggravating circumstance; rather, the prosecutor's comment was a proper appeal for law enforcement. See Smith v. State , 797 So.2d 503, 545 (Ala.Crim.App.2000) (holding that the prosecutor's comment that " 'the death penalty is society's effort to defend itself from the criminals among us' " was a permissible "appeal for law enforcement"); Ingram v. State, 779 So.2d 1225, 1267 (Ala.Crim.App.1999) (holding that the prosecutor's argument that capital punishment "was a form of 'self-defense' and was imposed for the sake of society" was not error); McWilliams v. State, 640 So.2d 982, 1001 (Ala.Crim.App.1991) ("deterrence, retribution, and society's right to self-defense" are proper subjects of prosecutorial argument). Because "society's right to self-defense [is a] proper subject[ ] of prosecutorial argument," McWilliams, 640 So.2d at 1001, no error, much less plain error, resulted from the prosecutor's comment. Therefore, this issue does not entitle Kelley to any relief.
IX.[7]
Kelley next argues that his sentence of death was imposed in violation of the holding of the Supreme Court of the United States in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Kelley acknowledges that the procedure by which he was sentenced to death *1063 complies with the Alabama Supreme Court's interpretation of Ring in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002). He, however, urges this Court to overrule Waldrop.
In Ring, the Supreme Court of the United States applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to death-penalty cases and held that under the Sixth Amendment, a capital defendant is "entitled to a jury determination of any fact [other than a prior conviction] on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589. In Ex parte Waldrop, the Alabama Supreme Court applied Ring to a similar situation and held:
"[W]hen a defendant is found guilty of a capital offense, 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala.Code 1975, § 13A-5-45(e) ; see also Ala.Code 1975, § 13A-5-50 ('The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as 'double-counting' or 'overlap,' and Alabama courts 'have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997) ; see also Coral v. State , 628 So.2d 954, 965 (Ala.Crim.App.1992).
"Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was 'proven beyond a reasonable doubt.' Ala.Code 1975, § 13A-5-45(e) ; Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.' Ring [v. Arizona] , 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443 [ (2002) ]. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring, and Apprendi [v. New Jersey, 530 U.S. 466 (2000),] require."
859 So.2d at 1188.
Like Waldrop, Kelley was convicted of a capital offense that has a corresponding aggravating circumstance, i.e., the murder was committed during the course of a kidnapping. See §§ 13A-5-40(a)(1), 13A-5-49(4), Ala.Code 1975. Accordingly, the jury's verdict finding Kelley guilty of murder made capital because it was committed during the course of a kidnapping established that the jury unanimously found that that aggravating circumstance existed. Because the jury's guilt-phase verdict established that the jury found a fact necessary to expose Kelley to a sentence of death, his argument that his death sentence violated Ring is without merit under Waldrop.
Kelley argues that Waldrop should be overruled because it "unfairly skews sentencing toward the imposition of the death penalty" and because it allows *1064 the jury and the judge to consider aggravating circumstances that were not "charged in the indictment." (Kelley's brief, at 97-98.) Specifically, Kelley argues that the Alabama Supreme Court's decision in Waldrop allows consideration of uncharged aggravating circumstances that are in addition to those charged in the indictment. This Court is bound by the decisions of the Alabama Supreme Court and has no authority to overrule those decisions. See § 12-3-16, Ala.Code 1975; Whatley v. State , 146 So.3d 437, 449 (Ala.Crim.App.2010) (opinion on return to remand).
Moreover, in Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006), this Court rejected Kelley's argument that consideration of aggravating circumstances not contained in the indictment violated Ring. Specifically, this Court explained:
"This Court, in Stallworth v. State, [868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand) ], specifically rejected an argument virtually identical to Lewis's-namely, that 'the indictment [against him] was void because it failed to include in the indictment the aggravating circumstances' that supported the capital offense. 868 So.2d at 1186. We rejected Stallworth's argument, holding that neither Ring v. Arizona [, 536 U.S. 584 (2002),] nor Apprendi v. New Jersey [, 530 U.S. 466 (2000),] modified prior Alabama caselaw, 'which holds that aggravating circumstances do not have to be alleged in the indictment.' 868 So.2d at 1186. The indictment returned against Lewis advised him of the crime with which he was charged-the capital offense of murder during kidnapping, in violation of § 13A-5-40(a)(1), Ala.Code 1975-and set forth the elements of the offense that the State was required to prove. Included in the indictment was the aggravating circumstance of kidnapping in the first degree, thus placing Lewis on notice that, if convicted, he could be facing a death sentence. Because this single aggravating circumstance placed Lewis on notice that, if convicted of the charged offense he could be facing a potential death sentence, it was unnecessary for the State to amend the indictment so that it included all of the aggravating circumstances the State intended to prove at trial.
"Likewise, neither Ring v. Arizona nor Apprendi v. New Jersey requires that an accused be provided with advance notice of all aggravating circumstances upon which the State intends to rely. Indeed, this Court has stated the following with regard to the other enumerated aggravating circumstances listed in § 13A-5-49 that are not elements of a capital offense:
" 'The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Crim.App.1982), aff'd, 435 So.2d 1351 (Ala.1983). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir.1987) ; Knotts v. State, 686 So.2d 431 (Ala.Crim.App.[1995] ) ; Ruffin v. State, 397 So.2d 277, 282 (Fla.1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements.'
" Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). Cf.
*1065 Arthur v. State , 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when aggravating circumstances relied on by the State are elements of the capital offense they must be charged in the indictment)."
Lewis, 24 So.3d at 534-35.
Here, the indictment charged Kelley with murder made capital because it was committed during a kidnapping, a circumstance that serves both to make the murder a capital offense and as an aggravating circumstance. "Because this single aggravating circumstance placed [Kelley] on notice that, if convicted of the charged offense he could be facing a potential death sentence, it was unnecessary for the State to amend the indictment so that it included all of the aggravating circumstances the State intended to prove at trial." Lewis, 24 So.3d at 534. Therefore, Kelley's argument is without merit and does not entitle him to any relief.
X.
Kelley further argues that the cumulative effect of the errors requires that he be granted a new trial.
The Alabama Supreme Court has explained:
" '[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, [Ala. R.App. P.,] if the accumulated errors have "probably injuriously affected substantial rights of the parties," then the cumulative effect of the errors may require reversal.' Ex parte Woods, 789 So.2d 941, 942 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.)."
Brownfield v. State, 44 So.3d 1, 33 (Ala.Crim.App.2007).
Applying the standard set forth in Ex parte Woods, 789 So.2d 941 (Ala.2001), this Court has reviewed the alleged errors Kelley has raised on appeal and has scrupulously searched the record for errors not raised on appeal. Rule 45A, Ala. R.App. P. After a thorough review of the record, this Court is convinced that, individually or cumulatively, no error or errors occurred that would entitle Kelley to relief.
XI.
This Court noticed a possible double-jeopardy issue relating to Kelley's convictions for capital murder/sexual abuse and for sexual torture. Cf. Renney v. State , 53 So.3d 981, 989 (Ala.Crim.App.2010). After reviewing the statutory element of each crime, this Court holds that sexual torture is not a lesser-included offense of capital murder/sexual abuse.
The Supreme Court of the United States has held that the Double Jeopardy Clause of the Fifth Amendment contains three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (footnotes omitted), overruled on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). See Schiro v. Farley, 510 U.S. 222, 229, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (reaffirming the three protections of the Double Jeopardy Clause). "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense." Schiro, 510 U.S. at 229 (citing United States v. Wilson, 420 U.S. 332, 339, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) ). The Alabama Supreme Court has held that the Double Jeopardy Clause of Art. I, § 9, of the Alabama Constitution of 1901, applies to protect only those three areas enumerated in Pearce. See *1066 Ex parte Wright, 477 So.2d 492, 493 (Ala.1985) ; Adams v. State, 955 So.2d 1037, 1098 (Ala.Crim.App.2003), reversed on other grounds, Ex parte Adams, 955 So.2d 1106 (Ala.2005).
In Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court of the United States enumerated the "same elements" test for determining whether two charges constitute the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment. Under the Blockburger test, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." Id. The Supreme Court of the United States has also held "that a lesser included and a greater offense are the same under Blockburger...." Brown v. Ohio, 432 U.S. 161, 166 n. 6, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). See also Perkinson v. State , 273 Ga. 491, 494, 542 S.E.2d 92, 95 (2001) ("For double jeopardy purposes, a lesser-included and a greater offense are the 'same offense' under the Fifth Amendment because the lesser offense requires no proof beyond that which is required for the conviction of the greater offense." (citations omitted)). "In reviewing double jeopardy claims, this court must look to the identity of the offenses, not the act out of which the offenses arose." Wright v. City of Montgomery, 477 So.2d 489, 490 (Ala.Crim.App.1985) (emphasis omitted). In other words, "[t]he Blockburger test turns on the statutory elements of the two offenses, not on the actual evidence that may be used by the state in proving the crimes." Childers v. State, 899 So.2d 1025, 1028 (Ala.2004) (quoting Ex parte Wright, 477 So.2d 492, 493 (Ala.1985) ). See also United States v. Ibarguen-Mosquera , 634 F.3d 1370, 1382 (11th Cir.2011) (holding that "the court must only look to the elements of each crime to determine whether there are two offenses or one").
Here, Kelley was convicted of murder made capital because it was committed during the course of first-degree sexual abuse, and he was convicted of sexual torture. Section 13A-5-40(a)(8), Ala.Code 1975, provides that it is a capital offense to commit "[m]urder during sexual abuse in the first or second degree...." Section 13A-6-2(a)(1), Ala.Code 1975, provides, in relevant part, that "[a] person commits the crime of murder if he or she ... [w]ith intent to cause the death of another person, ... causes the death of that person...." Section 13A-6-66(a)(1), Ala.Code 1975, provides, in relevant part, that "[a] person commits the crime of sexual abuse in the first degree if ... [h]e subjects another person to sexual contact by forcible compulsion...." Section 13A-6-65.1(a)(1), Ala.Code 1975, provides that, "[a] person commits the crime of sexual torture ... [b]y penetrating the vagina or anus or mouth of another person with an inanimate object by forcible compulsion with the intent to sexually torture or to sexually abuse."
To convict a person of capital murder under § 13A-5-40(a)(8), Ala.Code 1975, the State must prove that the defendant: 1) intentionally murdered the victim; 2) during the course of subjecting the victim to forcible sexual contact. The State is not required to prove that the defendant "penetrat[ed] the vagina or anus or mouth of another person with an inanimate object...," § 13A-6-65.1(a)(1), Ala.Code 1975; therefore, a conviction for sexual torture under 13A-6-65.1(a)(1), Ala.Code 1975, requires proof of an element not required for a conviction for capital murder under § 13A-5-40(a)(8), Ala.Code 1975.
To convict a person of sexual torture under § 13A-6-65.1(a)(1), Ala.Code 1975, *1067 the State must prove that the defendant: 1) penetrated the vagina or anus or mouth of another person; 2) did so by forcible compulsion; and 3) did so with the intent to sexually torture or sexually abuse. The State is not required to prove that the defendant intentionally murdered the victim; therefore, a conviction of capital murder under § 13A-5-40(8), Ala.Code 1975, requires proof of an element not required under § 13A-6-65.1(a)(1), Ala.Code 1975. Finally, although there is some overlap between sexual abuse and sexual torture, a conviction of capital murder under § 13A-5-40(8), Ala.Code 1975, does not, like sexual torture, require proof that the defendant "penetrat[ed] the vagina or anus or mouth of another person with an inanimate object...." § 13A-6-65.1(a)(1), Ala.Code 1975; therefore, sexual torture under § 13A-6-65.1(a)(1), Ala.Code 1975, is not a lesser-included offense of murder made capital because it was committed during the course of a sexual abuse. § 13A-5-40(8), Ala.Code 1975. See Doster v. State , 72 So.3d 50, 91 (Ala.Crim.App.2010).
Because capital murder/sexual abuse and sexual torture each require proof of an element that the other does not, Kelley's convictions for both crimes do not offend the Double Jeopardy Clause of the Fifth Amendment. Consequently, this issue does not entitle Kelley to any relief.
XII.
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Kelley's sentences of death. Kelley was convicted of two counts of capital murder-murder during the course of a first-degree kidnapping, see § 13A-5-40(a)(1), Ala.Code 1975, and murder during the course of a sexual abuse, see § 13A-5-40(a)(8), Ala.Code 1975. The jury recommended by a vote of 10 to 2 that Kelly be sentenced to death.
The record does not reflect that Kelley's death sentences were imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. In its sentencing order, the circuit court stated that it found two aggravating circumstances: 1) Kelley committed the capital offense while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, a kidnapping, § 13A-5-49(4), Ala.Code 1975; and 2) Kelley's offense was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8), Ala. R.Crim. P. The circuit court then considered each of the statutory mitigating circumstances and found that one was applicable. Specifically, the court found that Kelley had no significant history of prior criminal activity. The circuit court also considered as nonstatutory mitigating circumstances evidence relating to Kelley's upbringing, evidence relating to his good relationship with his family, and evidence indicating that he was a friendly, helpful, considerate, and loving person. The sentencing order of the circuit court shows that it properly weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced Kelley to death. The record supports the findings of the circuit court.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating circumstances and the mitigating circumstances in order to determine whether Kelley's death sentence is proper. After independently weighing the aggravating and mitigating circumstances, this Court finds that Kelley's sentence of death is appropriate.
*1068 As required by § 13A-5-53(b)(3), Ala.Code 1975, this Court must now determine whether Kelley's sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. In this case, Kelley was convicted of one count of murder during a kidnapping and one count of murder during a sexual abuse. Further, the facts of Kelley's crime establish that it was heinous, atrocious, or cruel when compared to other capital offenses. Sentences of death have been imposed for similar crimes throughout the State. See Gissendanner v. State , 949 So.2d 956, 975 (Ala.Crim.App.2006) ; Smith v. State, 797 So.2d 503, 548 (Ala.Crim.App.2000) ; Thompson v. State, 542 So.2d 1286, 1288 (Ala.Crim.App.1988). Therefore, this Court finds that Kelley's death sentences are neither excessive nor disproportionate.[8]
Finally, this Court has searched the entire record for any error that may have adversely affected Kelley's substantial rights and has found none. See Rule 45A, Ala. R.App. P.
Accordingly, Kelley's capital-murder convictions, his sexual torture conviction, and sentences of death and life in prison are affirmed.
APPLICATION FOR REHEARING OVERRULED; OPINION OF MARCH 14, 2014, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
WELCH, BURKE, and JOINER, JJ., concur.
KELLUM, J., concurs in the result.

On rehearing, Kelley argues that this Court lacks jurisdiction to review his conviction for sexual torture because he was never sentenced in relation to that conviction. Kelley's argument is refuted by the record. (C. 322-24.)

Emily Milling and her husband, Brandon, had recently separated.

Kelley also told Heath that he had dropped Emily off at the club.

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Kelley's argument exemplifies why plain-error review is an inappropriate mechanism to address issues of first impression or to effectuate changes in the law. Here, because Kelley failed to raise his argument relating to advances in DNA analysis, there is nothing in the record to show that population-frequency statistics in relation to mixed DNA samples are reliable. Thus, the record is void of any evidence to support the proposition upon which Kelley urges this Court to change the law.

This Court is not holding that population-frequency statistics relating to DNA test results on a mixed sample are inadmissible. See Brown v. State , 11 So.3d 866, 898 (Ala.Crim.App. 2007). Instead, this Court is merely holding that under the current law, the circuit court is not required to force the State to present such evidence for DNA testimony regarding a mixed sample to be admissible. See Turner , 924 So.2d at 765-66.

In Section IX in Kelley's brief, he argues that his sentence of death is disproportionate to the sentences imposed for similar offenses. This Court addresses this issue in Part XII of this opinion as part of the mandatory proportionality review pursuant to § 13A-5-53, Ala.Code 1975.

This Court has considered the cases cited by Kelley in support of his argument that his sentences are disproportionate. Although those cases involve some similar facts and resulted in less than a sentence of death, this Court still holds that Kelley's death sentences are not disproportionate.